IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:14-CV-00195

| | |
|---|---|
| **JENEEN BROWN**, as an individual and as a representative of the classes,<br><br>Plaintiff,<br><br>v.<br><br>**DELHAIZE AMERICA, LLC**, and **FOOD LION, LLC**,<br><br>Defendants. | **BRIEF AMICI CURIAE OF THE NATIONAL CONSUMER LAW CENTER, DEMOS, THE NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, THE NATIONAL EMPLOYMENT LAW PROJECT, AND THE SOUTHERN COALITION FOR SOCIAL JUSTICE** |

**INTRODUCTION**

*Amici curiae* -- submit this brief in support of plaintiff JENEEN BROWN, and in support of the tens of millions of consumers who will be harmed if the district court adopts the broad and novel interpretation sought by Defendant to exclude criminal background checks from Federal Fair Credit Reporting Act ("FCRA")[1] coverage.

Food Lion ambitiously seeks expansion of the exclusion at 15 U.S.C. § 1681a(y) to include every employment use of criminal background checks where the employer has a policy against hiring an applicant with a purported criminal record. This is an exception that swallows the rule. This interpretation is contrary to the text of a decades-old statute as well as its remedial purpose and legislative history. Because this novel defense tactic appears in multiple courts as a coordinated strategy to manufacture a new FCRA defense, *Amici* ask the Court to consider this motion and these arguments in their

---
[1] 15 U.S.C. § 1681, *et seq*.

1

broader context.

## STATEMENT OF INTEREST

**The National Consumer Law Center** ("NCLC") is a nonprofit organization and possesses a unique expertise and interest because of its many years of work on protecting the integrity of the Fair Credit Reporting Act rights of low-income consumers. NCLC conducted an extensive analysis of the background screening industry and documented common mistakes and poor practices.

**Demos** is a public police organization working to ensure all people have an equal chance in our economy. Demos has conducted extensive research and advocacy in the area of use of credit reports in employment, and in particular the negative impact on disadvantaged populations, including women and people of color.

The **National Association of Consumer Advocates** ("NACA") is a non-profit association of attorneys and consumer advocates committed to representing consumers' interests. Our members are private and public sector attorneys, legal services attorneys, law professors and law students whose primary focus is the protection and representation of consumers. NACA's mission is to promote justice for all consumers by maintaining a forum for communication, networking, and information sharing among consumer advocates across the country, particularly regarding legal issues, and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair or abusive business practices that affect consumers. In pursuit of this mission, making certain that corporations comply with state and federal consumer protection laws in general and the FCRA in particular has been a continuing and significant concern of NACA since its

2

inception.

**The National Association of Criminal Defense Lawyers** ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

NACDL has a particular interest in this case as NACDL's official position is that "employers, landlords, and other decision-makers should be encouraged to offer opportunities to individuals with criminal records, and unwarranted discrimination based on a criminal record should be prohibited," as documented in a recently-released, groundbreaking report entitled *Collateral Damage: America's Failure to Forgive or Forget in the War on Crime – A Roadmap to Restore Rights and Status After Arrest or Conviction*. That report is available at http://www.nacdl.org/restoration/roadmapreport/.

**The National Employment Law Project** ("NELP") is a leader in the movement to restore fairness to the process of criminal background checks and remove unnecessary or badly-designed barriers to the employment of people with criminal records. NELP promotes model employment policies and basic protections that allow qualified workers with records to attain and retain quality jobs.

**The Southern Coalition for Social Justice** ("SCSJ") is a 501(c)3 nonprofit organization founded in August 2007 in Durham, North Carolina by a multidisciplinary

group, predominantly people of color, who believe that families and communities engaged in social justice struggles need a team of lawyers, social scientists, community organizers and media specialists to support them in their efforts to dismantle structural racism and oppression. Through its Criminal Justice Initiative, the SCSJ tackles racial discrimination at the legal and policy levels to eliminate obstacles facing those with criminal records as they attempt to re-enter the mainstream of society.

SCSJ provides direct reentry legal services and referrals (in the NC Triangle and Triad areas) to clients seeking to expunge their criminal records and obtain certificates of relief. Through this clinic, the SCSJ witnesses, firsthand, how Fair Credit Reporting Act violations undermine its clients' attempts to obtain meaningful employment and a better life for their families.

Pursuant to Local Rule 7.5(d), the undersigned counsel is a member in good standing of the North Carolina Bar and the bar of this court. No party or counsel for any party in the pending action authored the proposed amicus brief in whole or in part, or made a monetary contribution intended to fund the preparation or submission of the brief, and no other person or entity made a monetary contribution intended to fund the preparation or submission of the brief, other than the *amici curiae*, their members, or their counsel.

## ARGUMENT

**I. FAIR AND ACCURATE REPORTING OF CRIMINAL RECORD INFORMATION IS ESSENTIAL TO PROTECTING INDIVIDUALS' RIGHTS AND OPPORTUNITIES.**

The reach of the criminal justice system has grown dramatically in recent decades.

Approximately one in four adults has a criminal record.[2] The consequences of involvement in the criminal justice system are more serious and enduring than ever before. People face formidable barriers to achieving economic and social stability because of their criminal records, even those that are *de minimis* or decades old.

These barriers are exacerbated—often unfairly—by the commercial background-check industry's widespread dissemination of criminal record information to employers. Ninety-two percent of employers run background checks on prospective employees.[3] National Consumer Law Center, *Broken Records: How Errors by Criminal Background Checking Companies Harm Workers and Businesses* 20 (2012), *available at* http://www.nclc.org/images/pdf/pr-reports/broken-records-report.pdf; *see generally* Harry J. Holzer, et al., *Perceived Criminality, Criminal Background Checks, and the Racial Hiring Practices of Employers*, 49 J.L. & Econ. 451, 453-54 (2006).

**A.      Background Checks Contain a High Rate of Errors with Deleterious Impacts on Consumers.**

*Amici*'s clients are routinely denied jobs on the basis of criminal history reports that contain errors and/or violations. These errors are, in part, the result of the breathtaking scope of the background-check industry at every level. There are dozens of

---

[2] Sixty-five million Americans have a criminal record. Michelle Natividad Rodriguez & Maurice Ensellom, The National Employment Law Project, *65 Million "Need Not Apply": The Case for Reforming Criminal Background Checks for Employment* 1 (2011), *available at* http://nelp.3cdn.net/e9231d3aee1d058c9e_55im6wopc.pdf (last visited Aug. 1, 2014). This increase is a result of unduly punitive drug laws. *See generally* Drug Policy Alliance, *Drug War Statistics*, http://www.drugpolicy.org/drug-war-statistics (last visited Aug. 1, 2014).

[3] The background-check industry takes in $2 billion in annual revenue. IBISWorld, Inc., *Background Check Services in the US: Report Snapshot* (April 2014), *available at* http://www.ibisworld.com/industry/background-check-services.html (last visited July 29, 2014).

large corporations and hundreds—perhaps thousands, of smaller ones—that disseminate millions of criminal records compiled from a range of local, state, and federal sources.

Beyond the risks raised by the sheer volume of the information and players involved in the industry, the manner in which many companies prepare criminal history reports increases the risk of inaccuracies.[4] For example, many background-check companies purchase bulk criminal record information from courts in a static format such as microfiche, or access databases of information that are not updated. Scores of online background-check companies that now sell instantaneous criminal history reports provide consumer information that is not current – arrests that result in dismissals; misdemeanor convictions that began as felony charges. Few public records sources provide all personal identifiers associated with a record (social security number or full date of birth), causing a strong likelihood that a record may ne matched to the incorrect consumer. When background-check preparers rely on these records without further corroboration, the criminal history reports they sell fail to disclose subsequent, often mitigating, court activity in a case.

*Amici*'s clients are too often subjects of criminal history reports prepared by noncompliant companies that are either unaware of—or unconcerned with—consumer protection laws. Even companies that claim to follow good practices disclose erroneous information. The resulting reports include inaccurate, incomplete, or misleading criminal-record information, and do not give proper notice to the consumer. NCLC, *supra*, at

---

[4] One background-check company, for example, advertises access to its database of more than 500 million criminal records and more than 13 million photos. Backgroundchecks.com About Us, www.backgroundchecks.com/info.mvc/about-us (last visited August 6, 2014).

6

7-8. These errors include, among others:

- reporting the wrong person's criminal record;
- misclassification of the severity of an offense (reporting misdemeanors as felonies and infractions as misdemeanors);
- omission of court action subsequent to arrest or conviction;
- erroneously reporting the date of an expungement as the date of conviction, which misleads the employer or landlord to believe the offense is more recent than it actually is;
- reporting a single incident with multiple charges as separate incidents; and
- failing to provide a code section and instead listing an incorrect offense title.

*Id*.

The errors in background-checks are compounded when background check companies fail to comply with the notice provisions of the consumer protection laws. Federal law mandates that the subject of a criminal history report receive a copy of the report, both when the subject requests it and five days before the employer takes adverse action (under the FCRA). *See* 15 U.S.C. § 1681b(b)(3). In theory, these notice provisions give consumers the opportunity to inspect the report and correct inaccuracies. Unfortunately, in the experience of the clients and constituents whom *Amici* serve, background check companies frequently ignore these requirements. Subjects of criminal history reports may only discover and address errors and violations after—and only *if*— they receive the report from a prospective employer or landlord. There are thousands of background-check companies that sell criminal

7

history reports and consumers often do not get advance notice of which one will prepare their report. This makes it is nearly impossible for consumers to preemptively review and correct errors or violations contained in a report before it is disseminated to employers and landlords. Consequently, any necessary corrections to errors, if the background-check company makes them at all, usually come too late when the damage is done: The consumers have lost the jobs or housing opportunities, and suffered irreparable damage to their reputations.

Moreover, the information disseminated in overbroad criminal history reports, even when technically accurate, leads employers to make misguided hiring decisions. Sixty percent of employers admit that they would not or probably would not hire a person with a criminal record. *See* Harry J. Holtzer, Steven Raphael, and Michael A. Stoll, *How willing are employers to hire ex- offenders?* Focus, Vol. 23, No.2, Summer 2004, *available at* http://www.irp.wisc.edu/publications/focus/pdfs/foc232h.pdf. Underlying this unwillingness to hire people with records is the fact that employers significantly overestimate the reliability of a criminal record as a predictor for risk.[5] This practice runs counter to both employers' and applicants' interests.

A criminal history report is overbroad if it contains information about an arrest or detention that did not lead to conviction, a successfully completed diversion

---

[5] Employers also overestimate the risk of their liability for negligent hiring. April Frazier, *Negligent Hiring: Myth or Reality for Employers*, National H.I.R.E. Network, New York, New York , 2008, *available at* http://www.eastcounty1stop.org/docs/neg_hiring_1_30_08.pdf (finding that only ten percent of negligent hiring claims filed in 2003 involved the hiring of persons with criminal histories and only fifty percent of those claims received favorable decisions).

8

program, a stale conviction, or a conviction that was judicially set aside, dismissed, or expunged on a finding of rehabilitation. EEOC, *supra*, at 12-13. The reporting of, and the resulting undue weight given to, stale convictions and arrests not leading to conviction are particularly pernicious. Criminal history reports that contain older convictions are an unreliable tool for assessing an applicant's employability because within a relatively short period of time, a criminal conviction ceases to be a reliable predictor of future criminality.[6] It is only a few years before an individual's "criminal record empirically may be shown to be irrelevant as a factor in a hiring decision." Alfred Blumstein & Kiminori Nakamura, *'Redemption' in an Era of Widespread Criminal Background Checks*, 263 Natl. Inst. of Just. J. 10, 14-15 (2009), available at https://www.ncjrs.gov/pdffiles1/nij/226870.pdf.

Similarly, the reporting of and resulting reliance on an applicant's arrest or detention not leading to conviction is often both unfair and a poor way to measure the risk of an applicant. Many arrests do not lead to conviction.[7] These un-litigated events are, by definition, instances when the government never proved—and in many instances did not even file—a case against the arrestee. In many instances, an arrestee

---

[6] A person who committed an offense six or seven years ago is no more likely to re-offend than someone who has never committed an offense. *See* Megan C. Kurlychek, Robert Brame, & Shawn D. Bushway, *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology & Pub. Pol'y 3, 483-504 (2006); Megan C. Kurlychek, Robert Brame, & Shawn D. Bushway, *Enduring Risk? Old Criminal Records and Short-Term Predictions of Criminal Involvement*, 53 Crime & Delinq., 64-83 (2007).

[7] One-third of felony arrests never lead to conviction. *See* Bureau of Justice Statistics, Felony Defendants in Large Urban Counties, 2004, last revised Apr. 25, 2008, *available at* http://www.bjs.gov/content/pub/html/fdluc/2004/fdluc04st.pdf.

9

may be factually or actually innocent of the offense in question, or may be a victim of identity theft who is arrested for another person's crime. The background-check industry's reporting of arrests, and employers' and landlords' reliance on them for hiring and tenancy decisions, contravenes a cornerstone of our criminal justice system: the presumption that people are innocent until proven guilty. *Coffin v. U.S.,* 156 U.S. 432 (1895).

Overbroad reporting of criminal records also has a disparate impact on people of color, who are significantly overrepresented in the criminal justice system. Dorothy E. Roberts, *The Social and Moral Costs of Mass Incarceration in African American Communities*, 56 Stan. L. Rev. 1271, 1274 (2004). Compounding the injustices of their overrepresentation in the criminal justice system, African Americans and Latinos with criminal records experience significantly more difficulty securing employment than whites with criminal records.[8]

Inaccuracies in criminal record reporting result in grave economic and reputational damage to subjects of inaccurate reports.[9] The privacy harms resulting from the erroneous dissemination of criminal history information by background-check companies is particularly problematic when it implicates people who have committed

---

[8] Having a record reduces job interview callback rates generally but blacks with or without a criminal record are less likely to receive a callback for interviews than whites with a criminal record. Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937, 957-59 (2003).

[9] The public's concerns about the privacy of criminal records information is reflected in a survey that found that most adults (ninety percent) and eighty percent of young adults say that they "prefer that State agencies not use the Internet to post criminal history information that is already a matter of public record." U.S. Bureau of Justice Statistics, *Privacy, Technology, and Criminal Justice Information: Public Attitudes Toward Uses of Criminal History Information* 45 (July 2001).

10

no offense, such as victims of identity theft or someone who shares a common name with someone who does have a criminal record. NCLC, *supra*, at 15.

## II. CREATION OF A § 1681a(y) EXCLUSION WOULD REMOVE NEARLY ALL FCRA PROTECTIONS FROM EMPLOYMENT CRIMINAL RECORDS REPORTS.

One of the core purposes for the enactment of the FCRA in 1970 was to better ensure that employment-purpose consumer reports were accurate and to protect consumers from their arbitrary use:

> Employers were placing increasing reliance on consumer reporting agencies to obtain information on the backgrounds of prospective employees. Congress found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment. As Representative Sullivan remarked, "with the trend toward ... the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable." 116 Cong. Rec. 36570 (1970)."

*Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). Various protections are built in to the statute to accomplish its remedial purpose for employment reports.

The FCRA's principle protection against inaccurate information is the requirement that background-check companies (consumer reporting agencies) follow "reasonable" procedures to ensure "maximum possible accuracy." 15 U.S.C. § 1681e; *Dalton*, 257 F.3d at 415. Other important protections include limitations of the age and nature of certain criminal records that may be furnished in a consumer report and the requirement that the reporting agency follow "strict procedures designed to insure that whenever

11

public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. §§1681c, 1681k(a)(2).; *see also King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 312 (E.D. Pa. 2012); *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 563 (E.D. Ky. 2006). The FCRA also limits who can obtain a consumer's private-information consumer report and limits such access to a narrow set of enumerated purposes. 15 U.S.C. § 1681b.

And, especially pertinent to the present action, the FCRA imposes strict requirements on an entity that uses a criminal records background check (consumer report) for an employment purpose. When a potential employer intends to use a report, it must provide disclosure of the intended use to the consumer about whom the report will be obtained and obtain authorization from the consumer-employee. 15 U.S.C. § 1681b(b)(2). Thereafter, before the employer may contemplate using a derogatory report to take an "adverse action" (e.g. delay, deny or terminate employment), it must advise the applicant of that possibility and provide a copy of the subject report. 15 U.S.C. §1681b(b)(3)(A). The employment applicant is also entitled to receive notice from the employer when and if a background check is used to make an adverse hiring decision. That notice must provide the identity of the source of the information, and apprise the rejected applicant of the many rights available under the FCRA, including the right to see what is in the reporting agency's file and to dispute information that is incorrect. 15 U.S.C. § 1681m.

Under Defendant's novel interpretation, none of these protections would be

12

available to consumers in an employment context. Judicial enactment of a § 1681a(y) FCRA exclusion for every circumstance in which the employer has a "policy against employing those with certain criminal histories" (Dkt. No. 45, 2) – every employer who uses a criminal background check – would swallow the rule itself. It would eliminate not only the disclosure rights argued in this case, but all other protections currently protected by the FCRA. All of these protections – accuracy, notice and privacy - are triggered only by the furnishing or use of a "consumer report." A reporting agency is only obligated to ensure maximum possible accuracy when it furnishes a *consumer report*. 15 U.S. C. § 1681e(b). Obsolete records may not be furnished within a *consumer report*. 15 U.S. C. § 1681c. Only employment purpose public records in a *consumer report* must be complete and up to date. 15 U.S. C. § 1681k(a)(2). Consumer privacy is mandated only as to the publication of a *consumer report*. 15 U.S. C. § 1681b. While Food Lion, in this case, and other coordinating employer defense teams argue for creation of a narrow exclusion as to the modest requirements they face - §§ 1681b(b) – the reach and impact of this exclusion would be substantially greater. It would withdraw employment background checks from the many critical protections they have held for over forty years. Notably, because of the higher prevalence of encounters with the criminal justice system as discussed supra, such a reading would likely disproportionately deprive people of color of those protections.

Accordingly, in this case and others, *Amici* strongly oppose the creation of Defendant's requested exclusion of criminal background checks from FCRA governance for any employer that claims an established policy of not hiring applicants that fail a

13

criminal background check.

### III. SECTION 1681a(y) IS INAPPLICABLE TO FOOD LION AND SIMILARLY SITUATED EMPLOYMENT REPORT USERS.

Defendant argues that the FCRA does not apply to its use of criminal background checks. This recent defense argument claims that as of December 4, 2003, the FCRA now "allows employers to receive criminal record screens without going through the traditional FCRA disclosure, authorization, and notice requirements, conditioned in part on the receipt occurring in connection with one of various types of investigations – such as ensuring compliance with an employer policy against employing those with certain criminal histories." Dkt. No. 45, 2. Food Lion's defense team suggests that so long as an employment report user manufactures a policy against hiring consumers who do not pass a criminal background check, that dispositive report will be carved from the definition of "consumer report." Such an approach is contrary to the statutory text, the remedial purpose and the legislative history of the FCRA. Not a single court known to *Amici* has adopted this defense argument.[10] In contrast, this same argument was summarily rejected in a comparable case in this Circuit. *Kelvin Thomas, et al. v. FTS USA, LLC, et al.,* Civ. No. 3:13cv825 (E.D.Va. May 15, 2014)(Dkt. No. 22)(denying Defendants' motion to dismiss.)

Defendants do not contest that prior to December 4, 2003, employment

---

[10] Defendant's recitation of *Martin v. First Advantage Background Servs.*, 877 F. Supp. 2d 754 (D. Minn. 2012) is incorrect. In *Martin*, a bank argued that it was required to obtain a background check of certain employees in order to comply with Federal Institutions Reform, Recovery, and Enforcement Act (FIRREA), which prohibits any person who has been convicted of crimes involving dishonesty from "participat[ing] . . . in the conduct of the affair of any insured deposit institution." *Id.* at 759.

14

background checks were governed by the FCRA. Dkt. No. 45, 2. However, Defendant claims the 2003 amendments to the FCRA, the Fair and Accurate Credit Transactions Act ("FACTA"), "liberate[d] employers to collect criminal record screens without going through the traditional FCRA disclosure, authorization, and notice requirements[.]" Dkt. No. 35, 2. Food Lion asks the Court to find that Congress expressly repealed a set of (then) 30-year-old core rights and remedies applying the FCRA to employment reports and that it did so in virtual silence. Defendant asks for an expansive abrogation, rather than provide the FACTA amendment the remedial interpretation the law requires. *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 964-65 (6th Cir. 1998) (The court must be "guided by the fact that the FCRA is to be liberally construed in favor of the consumer[.]"); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (The statute's consumer-oriented objectives have always supported a liberal construction of the FCRA.)

Yet Defendant's request finds no support in legislative history or common sense. '[A]bsent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law.' " *Nat'l Fed'n of the Blind v. FTC,* 420 F.3d 331, 337 (4th Cir.2005) (quoting *In re Witt,* 113 F.3d 508, 513 (4th Cir.1997)). Thus, in amending FCRA, Congress should have expressed a clear intent to alter the existing enforcement scheme and revoke the private right of action. *See United States v. Langley,* 62 F.3d 602, 606 (4th Cir.1995) (en banc).

Common sense suggests that had Congress sought to eliminate nearly all employment purpose requirements of the FCRA, some member of the legislature would

15

have noted this withdrawal. *See Koons Buick, Pontiac & GMC, Inc. v. Nigh,* 543 U.S. 50, 63 (2004); *Dewsnup v. Timm,* 502 U.S. 410, 419–20 (1992); *Chisom v. Roemer,* 501 U.S. 380, 396 (1991). An examination of the legislative history reveals no mention of a wholesale withdrawal of the longstanding application of the FCRA to employers. To the contrary, every floor speech, conference report or other legislative statement describing the new exemption offered it as a narrow carve-out for investigations of specific incidents of employee misconduct. The sponsor of the specific FACTA provision that created § 1681a(y), Rep. Pete Sessions, provided the provision's most complete context and legislative history:

> Mr. Chairman, in order to provide a historical context to this hearing, I would like to recount briefly the events that have brought us here today. In 1999, the staff of the Federal Trade Commission issued an opinion known as the Vail opinion, concluding that outside consultants who perform investigations of alleged employee misconduct are considered to be credit reporting agencies.
>
> As a result, outside consultants and the employees who hire them to help ensure unbiased workplace safety are subject to a number of burdensome and unintended restrictions on their ability to perform these investigations safely, professionally, and efficiently. Accordingly, they are hampered in performing many kinds of workplace investigations, including employee complaints of sexual harassment, discrimination and threats of violence. For the last few Congresses, I have introduced legislation to fix this problem by removing the FCRA requirements for investigations of suspected misconduct related to employment and to compliance with existing laws and preexisting written policies of the employer.
>
> This proposed legislation also respects the rights of the subject of the workplace search, while removing employers from the onerous and potentially dangerous requirement to notify their subject prior to beginning an investigation. The removal of this requirement is important because it prevents violence from employees, from giving them time to cover their tracks, or to initiate intimidation against coworkers who make or corroborate complaints, and are an integral part to ensuring the veracity of

16

> data included in these complaints.
>
> Mr. Chairman, back in 1997 when a constituent brought the problems to me that she was having as a result of the Vail opinion, I was shocked to learn that federal law requires an employer who suspects that an employee is dealing drugs or engaged in other misconduct at the workplace to ask that employee's permission before beginning an investigation.
>
> Furthermore, I was greatly dismayed to find that federal law would also require that the same employer to provide to a potentially violent employee with a report identifying the coworker who made or who corroborated those allegations of wrongdoing, making those helpful employees who were only trying to make the workplace safer a target for violence or retribution, and placing themselves in harm.
>
> This important legislation that I have introduced removes requirements of the federal Fair Credit Reporting Act solely for the purpose of having unbiased third party professional investigations of illegal or unsafe activities in the workplace. These limited activities include drug use or the sale of drugs, violence, sexual harassment, employee discrimination, job safety or health violations, and criminal activities including theft, embezzlement, sabotage, arson, patient or elderly abuse, and child abuse.

Fair Acc. Credit Act Legis. History 12 (A&P), Arnold & Porter LLP Legislative History P.L. 108-159 Fair and Accurate Credit Transactions Act of 2003, 117 STAT. 1952 (2003)(Mr. Sessions). *See also* 149 Cong. Rec. E2512-02 (2003), Conf. Report on H.R. 2622, Fair And Accurate Credit Transactions Act of 2003, *Title VI-Protecting Employee Misconduct Investigations. Section 611. Certain employee investigation communications excluded from definition of consumer report,* 2003 WL 22900844 (Nov. 21, 2003)(Mr. Oxley) ("This provision is intended to address the ill effects of certain regulatory guidance issued by the FTC staff in 1999 that had the unintended consequence of deterring employers from using outside firms to investigate alleged employee misconduct, including racial discrimination and sexual harassment claims."); H.R. Rep.

17

108-263 (2003), reprinted in AP-FAIRCR-LH 50-C, 2003 WL 25429662, at 4 (Mrs. Jackson-Lee) ("Title VI, protecting employees' misconduct and investigation, tracks the legislation that I cosponsored along with the gentleman from Texas (Mr. Sessions), the gentleman from Massachusetts (Mr. Frank), and other Members of this body that frankly *deals with a question that is minute* maybe but is large in terms of the needs that it covers. … [T]his legislation really responds to the concerns that are raised, and that is, that the Fair Credit Reporting Act, as interpreted by the Federal Trade Commission, sometimes impedes investigations of workplace misconduct.")(emphasis added).

Given the choice between interpretations - one that is contrary to every contemporaneous written or spoken word describing the § 1681a(y) change – and a broad "exemption" that would virtually end FCRA governance of employment reports, the Court must chose the former. "Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme . . . ." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 710 (3d Cir. 2010).

## CONCLUSION

In enacting and amending the FCRA, Congress intended to enhance, not weaken state law consumer and privacy protections. Food Lion ambitiously seeks expansion of the exclusion at 15 U.S.C. § 1681a(y) to include every employment use of criminal background checks where the employer has a policy against hiring an applicant with a purported criminal record. This is an exception that swallows the rule. Defendant's interpretation of § 1681a(y) is contrary to the statutory text, the

18

remedial purpose of the law and its legislative history. For that reason, *Amici* respectfully request that this court deny Defendant's Motion to Dismiss.

Dated: August 11, 2014          Respectfully submitted,

 /s/John W. Van Alst_____
John W. Van Alst
North Carolina Bar # 26165
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
jvanalst@nclc.org

 /s/Anita S. Earls_____
Anita S. Earls
North Carolina Bar # 15597
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
919-323-3380 x 115
AnitaEarls@southerncoalition.org

Daryl V. Atkinson
North Carolina Bar # 39030
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
919-323-3380 x 153 (phone)
919-323-3942 (fax)
daryl@southerncoalition.org

Thomas K. Maher
North Carolina Bar #12771
North Carolina Office of Indigent Services
123 W. Main St., Suite 400
Durham, NC 27701
(919) 354-7200
Thomas.K.Maher@nccourts.org

Counsel for *Amici Curiae*

19

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and have verified that such filing will be sent electronically using the CM/ECF system to all counsel of record for the parties.

Dated: August 11, 2014

Respectfully submitted,

_/s/Anita S. Earls_____
Anita S. Earls
North Carolina Bar # 15597
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
919-323-3380 x 115
AnitaEarls@southerncoalition.org

*Counsel for Proposed Amici*